UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **SHEPARDS DISCOUNT DRUGS INC** | **CASE NO. 6:24-CV-00735** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **LOUISIANA WHOLESALE DRUG CO INC** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## REPORT AND RECOMMENDATION

Before the Court is Defendant's, Louisiana Wholesale Drug Co., Inc. ("LWD"), Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim. (Rec. Doc. 10). Plaintiff, Shepards Discount Drugs, Inc. ("Shepards"), opposes the Motion (Rec. Doc. 19), and LWD replied (Rec. Doc. 20). The Motion was referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this Court. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it is RECOMMENDED that LWD's Motion to Dismiss be GRANTED in part and DENIED in part.

### Factual Background

Shepards filed the present action on May 31, 2024, seeking damages and injunctive relief alleging violation of the Louisiana Unfair Trade Practices Act

("LUTPA") and breach of contract. (Rec. Doc. 1). On July 26, 2024, LWD filed the Motion to Dismiss (Rec. Doc. 10) presently before the Court.

According to the Complaint, Shepards is an independent community retail pharmacy in Columbia, Mississippi, who contracted with LWD to provide pharmaceuticals. (Rec. Doc. 1, ¶¶ 10 & 17). Per Shepards, LWD was their primary wholesaler and the only wholesaler from whom they ordered controlled substances. (*Id*. at ¶ 17). As a wholesale distributor, LWD maintains a compliance department that is responsible for onboarding new pharmacies and monitoring the dispensation of controlled substance medications. (*Id*. at ¶ 19). Shepards contends that "LWD's Compliance Department fails to adhere to the best compliance policies promulgated by the DEA and other regulatory agencies" and "does not follow its own compliance agreements." (*Id*. at ¶ 21).

Per Shepards, LWD requires all of its retail pharmacies to complete annual Customer Site Survey which includes signing a Compliance Agreement Form. (*Id*. at ¶ 24). Shepards reviewed and signed said Compliance Agreement Form annually. (*Id*.). The Compliance Agreement Form reads, in pertinent part, as follows:

- ("Customer") agrees that it will abide by all applicable laws, rules, regulations, ordinances and guidance of the federal Drug Enforcement Administration (DEA), the United States Food and Drug Administration (FDA), and the states into which it dispenses controlled substances and the states in which it is licensed. Customer agrees that if will not dispense controlled substances if it suspects that a prescription is not issued for a

- legitimate medical purpose or in the normal course of professional practice.

- Customer will provide to LWD any information regarding its dispensing and/or distribution of controlled substances which LWD may need to evaluate Customer's compliance with DEA or State regulations. LWD reserves the right in all cases to terminate sales of controlled substances to customers that do not meet LWD's Standards of Compliance.

- **Customer agrees to make LWD its Primary Controlled Substance supplier for any/all Controlled Substance products purchased. The Primary CS supplier/Backup CS supplier should reflect at least 95% to 5% ratio, for all CS products that said store has in stock.** (emphasis is original).

- Customer agrees to itself monitor and be alert to the proper usage of controlled drugs dispensed by it, and to exercise due diligence to ensure the legal compliance by its prescribers and patients with applicable laws and regulatory guidelines. Customer is expected to exercise its professional knowledge and expertise to keep current on all such legal and regulatory guidelines.

- Customer shall notify LWD Compliance with any pending or previous State Board action, DEA investigation or Compliance related issues. Failure to do so, will subject customer to termination of controlled substance ordering privileges.

(Rec. Doc. 1-4).

Notably, the Compliance Agreement Form also provides that "LWD reserves the right in all cases to terminate sales of controlled substances to customers that do not meet LWD's Standards of Compliance" and that the customer "agrees that failure to comply with this Agreement may result in the termination of the relationship between LWD and Customer…" (Rec. Doc. 1, ¶ 26; *see also* Rec. Doc.

3

1-4). Shepards maintains that it never received any document regarding LWD's "Standards of Compliance" referenced in the Compliance Agreement Form. (Rec. Doc. 1, ¶ 27). Shepards also signed a Controlled Substance Dispensing Agreement and a Subscription Agreement both of which detailed certain requirements and expectations of the business relationship. (*Id.* at ¶¶ 20 & 28).

According to Shepards, "LWD arbitrarily terminated [Shepards'] ordering privileges following an alleged increase in its purchase of opiates over a 6-month period." (*Id.* at ¶ 30). Specifically, "[o]n or about September 8, 2023, Brad Stevens, an LWD Compliance Officer, sent an e-mail to [Shepards] regarding a flag for growth of Hydrocodone 10 MG tabs. [Shepards] provided a timely response addressing the concerns." (*Id.* at ¶ 32). On September 12, 2023, LWD Compliance Officers conducted an in-person site visit whereat they informed Shepards that it was a top purchaser of opiates. (*Id.* at ¶ 33). Shepards contends that the Compliance Officers also informed them that "the ratio between his [controlled substance] purchases and other pharmaceutical purchases was below the 15% [controlled substance] perimeter set by LWD—i.e., [Shepards'] controlled substances purchases were less than 15% of its total drug purchases." (*Id.*).

On September 21, 2023, Shepards received an email from an LWD Compliance Officer asking them to "document everything in support of [their] hydrocodone numbers" and notified Shepards that they would like to see a decrease

4

in their hydrocodone numbers. (Rec. Doc. 1, ¶ 35; *see also* Rec. Doc. 1-8). The email did not cite any specific rules, regulations, policies, target numbers, or violations with respect to opiates or hydrocodone or indicate that failure to decrease numbers was in violation of any of LWD's Standards of Compliance. (*Id*.).

Per Shepards, they kept their controlled substance purchases to under 15% of their total purchases. (*Id*. at ¶ 38). In February 2024, LWD informed Shepards that they were under the 15% threshold for total controlled substance sales but that its sales of opiates had increased. (*Id*. at ¶ 40). On February 26, 2024, LWD terminated Shepards' controlled substance ordering privileges effective March 1, 2024. (*Id*. at ¶ 41; *see also* Rec. Doc. 1-9). Shepards contends that the termination e-mail falsely stated that they had been emailed, visited, and notified via telephone regarding its high volume of ordering and dispending opiates and that it had a history of documented violations. (Rec. Doc. 1, ¶¶ 42-43). Shepards denies having a history of documented violations with LWD or any other state or federal regulatory agency. (*Id*. at ¶ 43).

As a result of the termination, Shepards asserts that its customers were prejudiced with many of them experiencing disrupted access to their medications and they were forced to refer customers to competitor pharmacies. (*Id*. at ¶ 45). Shepards was also placed on Mallinckrodt's, a drug manufacturer, Suspicious Order Monitoring ("SOM") list "resulting in [Shepards] being unable to buy

5

pharmaceuticals from Mallinckrodt at a price that was commercially viable for Shepards'] customers." (*Id*. at ¶¶ 48-50). In sum, Shepards maintains that "LWD seeks to hide its own incompetence regarding [controlled substance] monitoring and compliance by creating false accusations of non-compliance and terminating its customer-pharmacies' [controlled substance] ordering privileges." (*Id*. at ¶ 53). Per Shepards, LWD's actions constitute a violation of LUTPA and beach of contract. Shepards seeks damages as well as injunctive relief to enjoin LWD from "unlawfully enforcing the termination of [Shepards'] controlled substance ordering privileges." (*Id*. at ¶ 69).

## Applicable Law

### I. Law applicable to Rule 12(b)(6)

When considering a motion to dismiss for failure to state a claim under F.R.C.P. Rule 12(b)(6), the district court must limit itself to the contents of the pleadings, including any attachments and exhibits thereto. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 375 (5th Cir. 2004). The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)); *Baker v. Putnal*, 75 F.3d 190, 196 (5th

Cir. 1996). However, conclusory allegations and unwarranted deductions of fact are not accepted as true, *Kaiser Aluminum & Chemical Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982) (citing *Associated Builders, Inc. v. Alabama Power Company*, 505 F.2d 97, 100 (5th Cir. 1974)); *Collins v. Morgan Stanley*, 224 F.3d at 498. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

To survive a Rule 12(b)(6) motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 127 U.S. at 570. The allegations must be sufficient "to raise a right to relief above the speculative level," and "the pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.* at 555 (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004)). "While a complaint . . . does not need *detailed* factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations, quotation marks, and brackets omitted; emphasis added). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the plaintiff fails to allege facts sufficient to "nudge[ ][his] claims across the line from

7

conceivable to plausible, [his] complaint must be dismissed." *Bell Atlantic v. Twombly*, 127 U.S. at 570.

A claim meets the test for facial plausibility "when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Therefore, "[t]he complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic v. Twombly*, 127 U.S. at 556). See also *In Re Southern Scrap*, 541 F.3d 584, 587 (5th Cir. 2008).

## II. LUTPA

LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. R.S. § 51:1405. "[W]hat constitutes an unfair trade practice is determined by the courts on a case-by-case basis," as the statute does not specify particular violations. *Zeigler v. Hous. Auth. of New Orleans*, 2012-1168 (La. App. 4 Cir. 4/24/13); 118 So. 3d 442, 453. "A practice is unfair when it offends established public policy and when the practice

is unethical, oppressive, unscrupulous, or substantially injurious." *Id.* (citing *Roustabouts, Inc. v. Hamer*, 447 So. 2d 543, 548 (La. App. 1 Cir. 1984) (internal alterations omitted)). "[T]he range of prohibited practices under LUTPA is extremely narrow, as LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence." *Quality Envtl. Processes v. I.P. Petroleum Co.*, 2013-1582 (La. 5/7/14); 144 So. 3d 1011, 1025. "Moreover, conduct that offends established public policy and is unethical is not necessarily a violation under LUTPA." *Id.* Only "egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA." *Cheramie Servs., Inc. v. Shell Deepwater Prod.*, 2009-1633 (La. 4/23/10); 35 So. 3d 1053, 1060. Furthermore, "[t]o sustain a cause of action under LUTPA, two things must be proved: (1) an ascertainable loss was suffered; and (2) the loss must result from another's use of unfair methods of competition and unfair or deceptive acts or practices." *Carroll Insulation & Window Co. v. Biomax Spray Foam Insulation*, 50,112 (La. App. 2 Cir 11/18/15); 180 So. 3d 518, 524.

To support its contention that LWD's actions violate LUTPA, Shepards maintains that LWD engaged in unfair and deceptive acts "by having members sign agreements regarding the distribution of [controlled substance] medications" and "by terminating [Shepards'] [controlled substance] ordering privileges based on conduct that was not prohibited or was outside the scope of these agreements." (Rec.

9

Doc. 19, p. 11; *see* Rec. Doc. 1). As noted above, Shepards contends that the termination e-mail falsely stated that they had been emailed, visited, and notified via telephone regarding its high volume or ordering and dispending opiates and that it had a history of documented violations, and Shepards denies having a history of documented violations with LWD or any other state or federal regulatory agency. (Rec. Doc. 1, ¶¶ 42-43).

LWD argues that Shepards' allegations are insufficient to meet the standard required for a LUTPA claim. (Rec. Docs. 10 & 13). Specifically, LWD notes that "LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions." (Rec. Doc. 13, p. 9); *see also Cheramie*, 35 So.3d at 1060. LWD maintains that it was "exercising its business judgment to cease the sale of controlled substances to a pharmacy that posed a risk to the company based on DEA diversion and compliance recommendations." (Rec. Doc. 13, p. 10). LWD also correctly points out that breach of contract allegations alone are insufficient to state a claim under LUTPA. *See Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993) ("[LUTPA] does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes.") (citing *State v. Orkin Exterminating Co.,* 528 So.2d 198, 202 (La. App 4 Cir. 1988)).

The Court finds that Shepards' allegations fall short of establishing a LUTPA claim. While Shepards maintains that its controlled substance ordering privileges were essentially terminated without notice or cause, its Complaint is replete with allegations regarding the ongoing monitoring and communications LWD had with them regarding their controlled substance ordering. Specifically, Shepards admits:

- September 8, 2023: An LWD Compliance Officer sent Shepards an e-mail regarding a flag for growth of Hydrocodone 10 MG tabs. (Rec. Doc. 1, ¶ 32).

- September 12, 2023: LWD Compliance Officers conducted an in-person site visit whereat they informed Shepards that it was a top purchaser of opiates. (*Id.* at ¶ 33).

- September 21, 2023: Shepards received an email from an LWD Compliance Officer asking them to "document everything in support of [their] hydrocodone numbers" and notified Shepards that they would like to see a decrease in their hydrocodone numbers. (*Id.* at ¶ 35; *see also* Rec. Doc. 1-8).

- February 2024: LWD informed Shepards that they were under the 15% threshold for total controlled substance sales but that its sales of opiates had increased. (*Id.* at ¶ 40).

- February 26, 2024: LWD terminated Shepards' controlled substance ordering privileges effective March 1, 2024. (*Id.* at ¶ 41; *see also* Rec. Doc. 1-9).

While Shepards may disagree with LWD's findings and actions, there is nothing to suggest that said findings or actions were egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct. *See*

*Cheramie*, 35 So.3d at 1060. Accordingly, the Court recommends that the LUTPA claim be dismissed.

### III. <u>Breach of Contract</u>

As an initial matter, the Court notes that in a diversity case, federal courts must apply state substantive law to the claim at hand. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). Under Louisiana law, "a breach-of-contract claim has three 'essential' elements: (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *IberiaBank v. Broussard*, 907 F.3d 826, 835 (5th Cir. 2018)(citing *Favrot v. Favrot*, 68 So.3d 1099, 1108–09 (La. App. 4 Cir. 2011)).

Shepards alleges they had a contractual relationship with LWD for the purchase and sale of controlled substances and that LWD breached that contract when it arbitrarily terminated Shepards' controlled substance ordering privileges. (Rec. Docs. 1 & 19). LWD maintains that it was not contractually obligated to provide controlled substances to Shepards and therefore not liable for terminating Shepards' controlled substance ordering privileges. (Rec. Doc. 13).

In Louisiana, the four elements of a valid contract are "capacity, consent, a lawful cause, and a valid object." *Granger v. Christus Health Cent. La.*, 2012-1892 (La. 6/28/13), 144 So. 3d 736, 760. Explained another way:

> A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. An obligation cannot exist without a lawful cause. La. C.C. art. 1966. Cause is the reason why a party obligates himself. La. C.C. art. 1967. Where there is no "meeting of the minds" between the parties, there is no consent, thus no enforceable contract.

*Ricky's Diesel Serv., Inc. v. Pinell*, 2004-0202 (La. App. 1 Cir. 2/11/05), 906 So. 2d 536, 538.

LWD contends there was no contract between the parties. (Rec. Doc. 13). LWD asserts that "[n]othing in either the Complaint or the 'Compliance Agreement Form,' which [Shepards] asserts is the contract, tends to show that LWD is a party or 'obligor' to the agreement." (*Id*. at p. 13). LWD argues that the Compliance Agreement Form imposes an obligation on the signatory to comply with certain standards but imposes no reciprocal obligation on the part of LWD. (*Id*.). LWD notes that it also never signed the Agreement. (*Id*. at p. 12). In Louisiana, however, contracts can be express or implied. *Okuarume v. S. Univ. of New Orleans*, 2017-0897 (La. App. 4 Cir. 4/25/18), 245 So. 3d 1260, 1265, writ denied, 2018-0880 (La. 9/28/18), 252 So. 3d 927. "An implied in fact contract rests upon consent implied from facts and circumstances showing a mutual intention to contract. Consent to an obligation may be implied from action only when circumstances unequivocally indicate an agreement or when the law presumes it." *Id*. (citing *Union Texas Petroleum Corp. v. Mid Louisiana Gas Co*., (La.App. 4 Cir. 2/12/1987) 503 So.2d 159, 165).

In the alternative, LWD contends if a contract existed, it was properly terminated pursuant to Louisiana Civil Code Article 2024. Article 2024 provides that "[a] contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party." "If reasonable notice is not given, then the existing contract remains in force and continues to govern the parties' relationship." *Stegall v. Orr Motors of Little Rock, Inc.*, 48,241 (La. 2d Cir. 2013), 121 So.3d 684, 689. Even if a contract has an "at will" termination provision, however, the terminating party must exercise good faith. That is,

> [i]n order to comply with the requirement of good faith, a party exercising his right to terminate a contract at will should consider not only his own advantage, but also the hardship to which the other party will be subjected because of the termination.

*Volentine v. Raeford Farms of Louisiana, L.L.C.,* 48,219 (La. App. 2 Cir. 7/24/13), 121 So. 3d 742, 754, (citing La. Civ. Code art. 1770, Revision Comment (f)).

Shepards asserts that there are three contracts pertinent to their breach of contract claim. (Rec. Doc. 19). First, the Subscriber Agreement which required Shepards to buy 95% of its prescription purchases from LWD. (Rec. Doc. 1-3). Second, the Compliance Agreement Form wherein Shepards agreed to abide by certain conditions regarding the purchase and dispensation of controlled substances. (Rec. Doc. 1-4). And lastly, the Controlled Substance Dispensing Agreement which

provided a checklist regarding the dispensation on controlled substances. (Rec. Doc. 1-5).

Shepards asserts that it is clear from these documents that there was a contract for the buying and selling of prescription medications, including controlled substances. (Rec. Docs. 1 & 19). Specifically, Shepards points to the following Compliance Agreement Form provision: "LWD reserves the right in all cases to terminate sales of controlled substances to customers that do not meet LWD's Standards of Compliance" and that the customer's "failure to comply with this Agreement may result in the termination of the relationship between LWD and Customer…" (Rec. Doc. 1, ¶ 26; *see also* Rec. Doc. 1-4). Shepards contends that "this Agreement limits termination of [controlled substance] privileges to the conditions set forth in the Agreement, none of which were implicated in [Shepards'] termination." (Rec. Doc. 19, p. 13). Stated another way, Shepards contends that LWD was obligated to provide them with controlled substances unless and until there was a violation of one of the enumerated conditions. Shepards maintains they did not violate any of the enumerated conditions and thus the termination of their ordering privileges constituted a breach of contract.

Taking all of the facts in the Complaint as true and viewing them in the light most favorable to Shepards, the Court finds that Shepards has alleged facts showing the existence of a contract sufficient to trigger a breach. Further, Shepards has

sufficiently alleged that LWD "undertook an obligation" to provide Shepards with controlled substances so long as Shepards did not violate the conditions set forth in the Compliance Agreement. (Rec. Doc. 1); *See also IberiaBank* 907 F.3d at 835. Shepards also sufficiently pleaded that LWD "failed to perform the obligation" when it terminated Shepards controlled substances ordering privileges when Shepards did not violate the conditions set forth in the Compliance Agreement. (*Id.*). Lastly, Shepards sufficiently alleged that it has suffered quantifiable economic loss as a result of LWD's termination, namely loss of business. (*Id.*). Accordingly, considering the applicable lenient legal standard, it is recommended that LWD's Motion to Dismiss be denied as it pertains to Shepards' breach of contract claim.

## IV. <u>Injunctive Relief</u>

Shepards seeks injunctive relief to prevent LWD from enforcing the termination of Shepards' controlled substances ordering privileges. (Rec. Doc. 1, ¶¶ 68-73). Shepards' Complaint makes clear that they are seeking a preliminary injunction. (*Id.*). Preliminary injunctions are governed by F.R.C.P. Rule 65. The Fifth Circuit set forth the following standard for issuance of an injunction:

> Plaintiffs seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest. A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements.

*Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (cleaned up).

The question for the Court, however, is not whether Shepards is entitled to injunctive relief at this time, but whether Shepards has sufficiently stated a claim for injunctive relief. The Court finds that Shepards has not sustained its burden. First, Shepards has not shown that it has a substantial likelihood of success on the merits. The Court recommends dismissal of Shepards' LUPTA count and finds that injunctive relief is not an appropriate remedy for breach of contract because those damages can be compensated in money and can be measured by a pecuniary standard. The Court also questions its ability to force a private company to conduct business with another private party.

Having found that Shepards failed to allege substantial likelihood of success on the merits, the Court need not address the remaining factors; however, the Court also finds that Shepards has not shown a substantial threat that it will suffer irreparable harm. While Shepards alleged that it was "forced to refer its [controlled substance] customers to competitors, which undoubtedly resulted in a loss of a portion of its non-controlled business as well" (Rec. Doc. 1, ¶ 45), there is no indication that it is in imminent danger of going out of business. Shepards also points to its "tarnished reputation" and how its "ability to contract with another wholesale drug distributor is greatly hindered by LWD's termination of controlled substance ordering privileges;" however, the Court again finds that this falls short of

irreparable harm. (*Id*. at ¶¶ 55-56). The Court also finds that while the public has an interest in not seeing patients' care disrupted by the sudden termination of access to needed medicine, the public also has an interest in seeing steps taken to reduce the risk of dangerous drugs' diversion or abuse. Accordingly, the Court recommends that Shepards' request for injunctive relief be denied at this time.

## Conclusion

For the reasons discussed herein, it is recommended that LWD's Rule 12(b)(6) Motion (Rec. Doc. 10) be GRANTED as to Shepards' LUTPA claim and DENIED as to Shepards' breach of contract claim. The Court also recommends that Shepards' request for injunctive relief be denied at this time.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual

findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 11th day of October, 2024.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE